### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF LOUISIANA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| **LEISHA LINDSEY** | **CIVIL ACTION NO. 1:18-cv-00680** |
| | **JUDGE DEE D. DRELL** |
| *versus* | |
| | **MAGISTRATE JUDGE PEREZ-MONTES** |
| **BMA MEDICAL CARE** | |
| **LOUISIANA DIALYSIS GROUP, LLC** | **JURY DEMAND** |

---

### MEMORANDUM IN OPPOSITION TO
### BIOMEDICAL APPLICATIONS OF LOUISIANA'S
### MOTION FOR SUMMARY JUDGMENT

Respectfully submitted by:

Allison A. Jones, T.A.
La. Bar Roll No. 16990
DOWNER, JONES, MARINO & WILHITE
401 Market Street, Suite 1250
Shreveport, Louisiana 71101
Phone:    (318) 213-4444
Fax:        (318) 213-4445
Email:     ajones@dhw-law.com

*Attorneys for Leisha Lindsey*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

II.   STATEMENT OF FACTS ...................................................................................... 2

  A.    LEGAL STANDARDS FOR SUMMARY JUDGMENT ........................... 10

  B.    THE FAMILY AND MEDICAL LEAVE ACT ......................................... 12

    1.   Lindsey Has a Prima Facie Case of Interference Under FMLA .................. 12

    2.   Lindsey Has a Prima Facie Case of Retaliation Under FMLA.................... 13

      a)   The Corrective Action, the Performance Improvement Plan, the Final Written Warming, Lowered Performance Evaluation and the Termination of Lindsey's Employment Constitute Adverse Actions................................................................. 14

      b)   The Adverse Actions, Including the Termination of Lindsey's Employment Were Motivated by Lindsey's Taking of Protected Leave Under the FMLA .................. 16

    3.   BMA's Proferred Legitimate Business Reason for Taking Adverse Employment Action is Pretextual........................................................................................... 20

  C.    LOUISIANA'S WHISTLEBLOWER PROTECTION ACT AND LOUISIANA EMPLOYMENT DISCRIMINATION LAW ........................................... 22

  D.    INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ................. 23

IV.   CONCLUSION ..................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) .................................................14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-256 (1986)....................................................11

*Andrews v. City of Philadelphia*, 895 F 2d 1469, 1484 (3d Cir. 1990) ..........................................25

*Bertrand v. City of Lake Charles*, 2012 U.S. Dist. LEXIS 63330, 17-18 (W.D. La. 2012) ..........14

*Broderick v. Donaldson*, 437 F. 3d 1226, 1232 (D.C. Cir. 2006).....................................................14

*Burlington Northern and Santa Fe Railway Co v. White* 548 U.S.53 (2006)....................14, 15, 16

*Bustamento v. Tucker*, 607 So.2d 532, 538 (La. 1992)......................................................23, 24, 25

*Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017)..............................................................12

*Clark County School District v. Breeden, Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001)*..........................................................................................................................20

Credeur v. Louisiana Through Office of Attorney General,  860 F.3d 785 (5th Cir. 2017)...........15

*D'Onofrio v. Vacation Publs.,*  888 F.3d 197 (5th Cir. 2018) ..........................................................13

*Evans v. Books-a-Million*, 762 F.3d 1288, 1297 (11 Cir. 2014)......................................................13

*Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001).........................................................19

*Hernandez v. Johnson, 514 Fed. Appx 492 (5th  Cir. 2013)* .........................................................16

*Hunt v. Rapides Healthcare Sys. LLC,* 277 F. 3d 757, 768 (5th Cir. 2001) ............................13, 21

*Ion v. Chevron USA, Inc.* 731 F.3d 59, 62 (5th Cir. 2013) ...................................................2, 17, 21

*Jackson v. BNSF Railway Co*, 2018 U.S. App. LEXIS 29890 (5th Cir. Oct. 23, 2018).................12

*Jones v. Gulf Coast Heath Care of Delaware*, 854 F.3d 1261 (11th Cir. 2017) ............................19

*Kasten v. Saint-Gobain Performance Corp.,* 1131 S.Ct. 1325 (2011) ...........................................14

*Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995).........................................................................11

*Lorentz v. Alcon Labs., Inc.*, 13-20049, 535 Fed. Appx. 319, 2013 U.S. App. LEXIS 13728, 2013 WL 3368987 (5th Cir. July 8, 2013)................................................................................................21

*Lushute v. Louisiana*, 479 Fed. Appx. 553, 554 (5th Cir. 2012) ....................................................13

*Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005)................................................21

*Maggio v. St. Francis Med. Ctr., Inc.*, 391 So.2d 948 (La. App. 2d Cir. 1980) ............................24

*Martin v. Wilks*, 490 U.S. 755, 762 (1989) .....................................................................................11

*Massey-Diaz v. Univ. of Iowa Comty. Med. Servs. Inc.*, 826 F.3d 1149, 1159060 (8th Cir. 2016).13

*Mauder v. Metropolitan Transit Authority*, 446 F.3d 574 at 583 (5th Cir. 2006)...........................19

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................................................1, 14, 25

*Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 875 (S.D. Tex. 2008)..........14

*Randolph v. Laeisz*, 896 F. 2d 964, 969 (5th Cir. 1990)..................................................................12

*Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F. 2d 577, 578 (5th Cir. 1986)..................................12

*Richard v. Cingular Wireless LLC*, 233 Fed. Appx. 334, 338 (5th Cir. 2007)..............................19

*Richardson v. Monitronics International, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) .............2, 16, 21

*Russ v. International Paper Co.*, 943 F. 2d 589, 591 (5th Cir. 1991)..............................................11

Simmons-Meyers v. Caesars Enttmt Corp, 515 Fed.Appx 369 (5th Cir 2013) .............................16

*Stump v. City of Shreveport,* No. CIV A 13-3053, 2015 U.S. Dist. LEXIS 134989, 2015 WL 5794474 at *46 (W.D. La. Sept. 30, 2015) ...................................................................................20

*Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) ............................................19

*Transcontinental Gas. v. Transportation Ins.*, 953 F.2d 985 (5th Cir. 1992)................................23

*Veillon v. Exploration Servs., Inc.*, 876 F. 2d 1197, 1200 (5th Cir. 1989) ....................................11

*Vincent v. Coll of the Mainland*, 2016 U.S. Dist. Lexis 135122, n. 31 (S.D. Tex. Sept 30, 2016) 17

*Wallace v. DTG Operations, Inc.*, 442 F. 3d 1112, 1118 (8th Cir. 2006) ...................................... 11
*Ware v. CLECO Power LLC*, 90 Fed. Appx. 705,  708 (5th Cir. 2004) ..................................... 19
*White v. Monsanto*, 585 So. 2d 1205, 1209 (La. 1991) ...................................... 23, 24, 25
*Wright v. Otis Engineering Corp.*, 643 So. 2d 484, 487 (La. App. 3 Cir. 1994) ............................ 25

## Statutes

29 U.S.C. § 2615 (a)(1) and (ii) ................................................................................... 12
29 U.S.C. § 2615(a)(2) ................................................................................................ 12
29 U.S.C. §2601(b)(2) ................................................................................................ 12
29 U.S.C. §2615(a) ..................................................................................................... 12
FRCP 56(a) .................................................................................................................. 10
FRCP. 56(c) ................................................................................................................. 11
La. R.S. 23:967 ........................................................................................................... 22
La. R.S. 23:967(A)(3) ................................................................................................. 22
LA. Rev Stat Ann § 40:971(E) ................................................................................... 22

## Other Authorities

18 C. Wright, A. Miller, et al., *Federal Practice and Procedure* § 4449, at 417 (1981) ............... 11

iii

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **LEISHA LINDSEY** | * | **CIVIL ACTION NO: 1:18-CV-00680** |
| *Versus* | * | **JUDGE DEE D. DRELL** |
| **BMA MEDICAL CARE** | * | **MAGISTRATE PEREZ-MONTES** |
| **LOUISIANA DIALYSIS GROUP, LLC** | * | **JURY DEMAND** |

**MEMORANDUM IN OPPOSITION TO
BIOMEDICAL APPLICATIONS OF LOUISIANA'S
MOTION FOR SUMMARY JUDGMENT**

**I.    INTRODUCTION**

Defendant, BIO-MEDICAL APPLCIATIONS OF LOUISIANA (currently identified as BMA MEDICAL CARE LOUISIANA DIALYSIS GROUP, LLC in the Complaint, ("BMA" or "Defendant" herein) filed a motion for summary judgment[1] arguing that Plaintiff LEISHA LINDSEY ("Lindsey" and/or "Plaintiff") cannot satisfy any burden of proof for any of her claims. As if to reinforce overuse of *she-can't-prove-it* motions for summary judgment, the BMA Motion entirely relies upon the burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). But, in doing so, BMA Motion fails to acknowledge all of Lindsey's protected activity, mischaracterizes events as being non-adverse employment acts, and, relying upon these failures and mischaracterizations presents a distorted and incorrect timeline of events to the Court.[2] Further, BMA applies the incorrect causation standard using the "but for" standard for all of Lindsey's claims rather than the proper mixed-motive "motivating factor" standard that applies to

---

[1]    Rec. Doc. 20, hereinafter referred to as the "BMA Motion."
[2]    For purpose of facilitating this Court's understanding of the factual background and the timeline, Lindsey attaches hereto and makes a part hereof as Exhibit "A" a demonstrative summary of the timeline of events.

cases under the Family Medical Leave Act ("FMLA").[3] As such, the BMA Motion is fundamentally flawed. For all of the reasons set forth herein, the BMA Motion should be denied in all respects. Lindsey has established a *prima facie* case of discrimination and retaliation, and BMA has failed to proffer a legitimate business reason that is worthy of credence. Lindsey should be allowed her day in court.

## II.        STATEMENT OF FACTS

BMA filed a LR 56.1 Statement of Undisputed Material Facts ("BMA Statement"), but, as shown in Lindsey's Answer to BMA Statement and also in Statement of Leisha Lindsey,[4] much of BMA's Statement is contested, creating genuine issues of fact.

Lindsey became employed with BMA on January 18, 1999, as a nurse in BMA's clinic located in Bunkie, Louisiana.[5] She was hired by the Director of Operations for the region that included the Bunkie Clinic, David Powe.[6] During the entire time Lindsey was a nurse in the Bunkie Clinic "she was  a good nurse" who was "good at her duties," and Powe "never had any problems

---

[3]    The United States Fifth Circuit Court of Appeals has never once applied the "but for" causation standard to claims arising under the FMLA or to the "regarded as" prong of the ADA, and, indeed, even post *Gross* has continued to apply the "motivating factor" standard. *Ion v. Chevron USA, Inc.* 731 F.3d 379 (5th Cir. 2013); *Richardson v. Monitronics International, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (Mixed-motive framework applies to FMLA cases). See also further discussion the Fifth Circuit Pattern Jury Instructions 11.2.1.

[4]    For purposes of this Statement of Facts, all statements set forth below are supported by Statement of Leisha Lindsey in support of Opposition to BMA Motion which Statement of Leisha Lindsey is incorporated by reference in globo without further pinpoint citations unless an exhibit is referenced or the statement is not otherwise supported by citation of other witnesses.

[5]    Powe Deposition is attached hereto as Exhibit "B" with exhibits referenced therein. Exhibit B, Powe Depo, at p 15 ll. 15-18, p. 16, ll. 5-6. Statement of Leisha Lindsey with attachments is filed simultaneously herewith.

[6]    Exhibit B, Powe Depo, at p. 14-15. The region included four clinics in Alexandria, Louisiana, one in Bunkie, Louisiana, one in Marksville, Louisiana, one in Leesville, Louisiana and one in Pineville, Louisiana, *Id* at p. 15, ll. 9-11.

with her" and "never heard of any problems with her."[7] As a result, Lindsey was promoted to Director of Nursing of the Bunkie Clinic on September 11, 2001, which title was changed to Clinic Manager on September 3, 2003.[8] Powe remained Lindsey's Director of Operations and, as a result, evaluated Lindsey's job performance as Clinical Manager.[9]  For the years 2010-2015, Lindsey always received a "meets standards or a "commendable" rating as a Clinical Manager for the Bunkie Clinic and had positive narrative information included in her evaluations.[10]

On July 5, 2016, Lindsey took a leave under the FMLA - her first one in all 18.5 years of working with BMA.[11]  While on FMLA leave, Lindsey was required to continue working and perform several of her duties, including, but not limited to, addressing employee issues, scheduling staff to cover patient care, editing and approving staff payroll, addressing medication changes and lab reviews, and working with Human Resource recruiter to hire Registered Nurse  replacement.[12] Lindsey believed that she was required to perform these job duties as no one was assigned to perform the duties in her absence.[13] Further, Powe and other employees of the Bunkie Clinic remained in contact with Lindsey by telephone and email, and Powe was aware that Lindsey was performing many of her job duties while on protected FMLA.[14]  Specifically, during the time that Lindsey was on FMLA leave, no one was assigned to assume her job duties of preparing schedules for employees in the Bunkie Clinic such that Lindsey was required, with Powe's knowledge, to

---

[7]     Powe Depo, at p. 15, ll. 22-25.
[8]     Powe Depo, at p. 17, ll. 5-6.
[9]     Powe, Depo, at p. 16.
[10]    Powe Depo at p. 37, ll. 1-7. A summary of Lindsey's job performance evaluations and copies of the same are attached to Statement of Leisha Lindsey as Exhibit 1 thereto.
[11]    R. 1, para. 5; Powe Depo at p. 37, ll. 8-24; p. 38, ll.1-3
[12]    R. 1, para. 6. See Statement of Leisha Lindsey at para.8-11.
[13]    *Id*.
[14]    Powe Depo, at p. 39, ll. 16-25; p. 40 ll. 1-25; p. 42-43; p.47-50; Statement of Leisha Lindsey at para.8-11.

3

prepare the same.[15]  Further, during the months of July and August, 2016, while Lindsey was out on FMLA leave, Powe initiated discussions with his supervisor, Wayne Bernard, about taking disciplinary actions  against Lindsey including possible termination of employment.[16]

Lindsey returned to work from her protected FMLA leave on August 16, 2016.[17]  Upon her return to work, Lindsey began to believe that she was being targeted. For example, Lindsey was required to prepare minutes of meeting that were held on August 15, 2016, while she was on FMLA leave.[18] Lindsey requested information in order to complete the same, and  Powe did not provided this information to Lindsey, yet, Lindsey, nonetheless, completed as much of the minutes as possible.[19]

On August, 31, 2016, Lindsey attended a clinic meeting with Powe and other Bunkie Clinic social workers and other drug representatives.[20]  During the meeting on August 31, 2016, it was suggested by Cecilia "Toby" Robinson, social worker, and agreed upon by Mr. Powe, that patients be given medications left over from patients who were deceased.[21] Lindsey voiced her disapproval, as she believed it was unethical and violated federal and state laws.

On September 2, 2016, at 1:39 AM, Lindsey emailed Powe and Ms. Jada Mooney ("Mooney"), Regional Quality Manager,  and reaffirmed in writing that she objected to and refused to participate in actions that were state and federal law violations  stating specifically that she had instructed her employees to refuse to participate in these state and federal law violations.[22] This

---

[15]     Exhibit B, Powe Depo at p. 82, ll. 22-25; p. 83, ll. 15-17; Statement of Leisha Lindsey at para. 8-11.
[16]     Exhibit B, Powe Depo, at pp. 74-75.
[17]     R. 1, para.7; Powe Depo at p. 45, ll. 19-22.
[18]     R. 1, paras. 8-9.
[19]     *Id*.
[20]     R. 1, para. 10; Powe Depo at pp. 54-57.
[21]     R. 1., para. 11.
[22]     Exhibit B, Powe Depo, at p. 57, ll. 2-9.

email was read by Powe early in the morning of September 2, 2016.[23] September 3-5, 2016, was the Labor Day holiday for BMA.[24]

On Tuesday, September 6, 2016, less than twenty one (21) days after Lindsey's return to work from FMLA leave and within four (4) calendar days (three of which were BMA holidays) of her email opposing violations of state law, Lindsey was given a Corrective Action Form/Performance Improvement Plan ("CAF/PIP") – a first in her 18.5 years of employment with BMA.[25] Even more interesting is the fact that in the top left corner it is noted that this document was prepared September 2, 2016 - the same day Powe read Lindsey's e-mail, in which she opposed the unethical and illegal practices proposed by BMA.[26] Specifically, the CAF/PIP stated as follows:

> The Clinical Manager should be present at the facility during normal working hours (8 AM to 5 PM) to provide support and guidance to the staff. Leisha has not been consistently present during [sic] at the facility during normal hours and it is affecting the moral and operations at this facility.[27]

This CAF/PIP was given to Lindsey for allegedly not being present at the facility, despite the fact that from the dates August 16, 2016 – September 6, 2106, Powe could not identify one day that Lindsey did not work the required hours she was supposed to work.[28] Attached to the CAF/PIP and issued in conjunction with the same were the details of the Performance Improvement Plan ("PIP").[29] In the CAF/PIP, Lindsey was disciplined for: (i) *attendance*, (ii) failing to provide a four week interval schedule for employees for the Bunkie Clinic *for the entire month of August*,

---

23      R. 1, paras. 13-14; Exhibit B, Powe Depo, at p 64, ll. 2-4; See document labeled LL34, produced by Plaintiff to Defendant with her Initial Disclosures and attached to Statement of Leisha Lindsey as Exhibit "2."
24      *Id*.
25      Exhibit B, Powe Depo, at p. 67-69, 71-72. Powe Depo Exhibit 1, labeled BMA 00006.
26      R. 1, para. 15; Power Depo Exhibit 1, labeled BMA 00006.
27      Exhibit B, Powe Depo Exhibit 1, labeled BMA 000006.
28      Exhibit B, Powe Depo at pp. 63-67.
29      Exhibit B, Powe Depo Exhibit 1, labeled BMA 000007.

*2016* (despite the fact that for the first two weeks of August, she was on protected FMLA leave), (iii) failing to delegate and distribute the workload; and (iv) implementation of a schedule software known as ScheduleWise.[30]  As noted, the  CAF/PIP  disciplined Lindsey for attendance despite  the fact that from the dates August 16, 2016 – September 6, 2106, Powe could not identify one day that Lindsey did not work the required hours she was supposed to work.[31]  Even worse,   Powe could not identify one instance where Lindsey had failed to delegate to other team members of  to distribute workload which occurred after Lindsey's return from FMLA leave.[32]  Nevertheless, Lindsey was placed on a CAF/PIP  that had a maximum date of sixty (60) days and stated specifically that "failure to achieve and maintain expectations for performance improvement may result in further action, up to and including termination."[33]  Believing the same to be retaliatory, Lindsey refused to sign the CAF/PIP.[34]  Notwithstanding her refusal to sign the documents, Lindsey complied, in all respects, with the mandates of the same.[35]  This compliance was acknowledged by Powe.[36]

> The BMA Employment Handbook provides for a progressive discipline policy as follows:
>
> It is FMCNA's policy that corrective action be escalating, beginning with the least severe action necessary to correct substandard performance or conduct and increasing in severity if the condition persists or subsequent infractions occur unless circumstances warrant immediate termination of employment.[37]

---

[30]    *Id*.; Powe Depo, at pp 82, ll. 22-25; p. 83, ll. 10-25, pp. 84-86.
[31]    Exhibit B, Powe Depo at pp. 63-67.
[32]    Exhibit B, Powe Depo at pp. 85-86.
[33]    Exhibit B, Powe Depo at p. 87, ll. 19-24, Powe Depo Exhibit 1, documents labeled 000007.
[34]    Exhibit B, Powe Depo at p 69, ll. 2-18.
[35]    Exhibit B, Powe Depo at p. 88, ll. 1-19, p. 89-90.
[36]    Exhibit B, Powe Depo at pp.  87-90.
[37]    See document labeled BMA 000109, attached to Statement of Leisha Lindsey as Exhibit "3."

The BMA CAF dated September 2, 2016, states the following types of progressive corrective actions: Documented Counseling, Written Warning, Final Written Warning, Disciplinary Suspension, and Termination.[38]

Unfortunately, on January 20, 2017, two months after determining that Lindsey was performing satisfactorily in her job duties, Lindsey was given a second Corrective Action Form, which skipped a the BMA progressive discipline policy step of "Written Warning," and  instead jumped to a  "Final Written Warning."[39] The decision to deviate from the BMA Employment Handbook's progressive discipline policy was made by Powe, with approval from Human Resources.[40] The Final Written Warning described Lindsey's prior CAF/PIP as "Documented Counseling – 9/6/-2016.  Work Attendance."[41] The Final Written Warning was also for "attendance," but only identified three dates that Lindsey was alleged to have additional "attendance issues." Other than these dates, Powe was unable to identify any other dates that Lindsey failed to attend work.[42] With respect to the dates identified in the Final Written Warning, the first was alleged to have occurred in September 28, 2016 -- only 22 days after the first CAF/PIP (which it is conceded that Lindsey satisfied) so reference to this date is irrelevant.[43] The second date included was January 11, 2016, a date when it is conceded that Lindsey was sick and had informed her office of the same, but had not informed Powe directly.[44] Lindsey was aware of no written policy requiring her to notify Powe of her illness and, she had, in fact, notified the Bunkie Clinic.[45] The third date included

---

[38]    Exhibit B, Powe Depo Exhibit 1, documents labeled 000005-000006.
[39]    Exhibit B, Powe Depo at p. 90-91.
[40]    Exhibit B, Powe Depo at p. 91, ll. 3-7.
[41]    Exhibit B, Powe Depo Exhibit 1 at p. 00008.
[42]    Exhibit B, Powe Depo at p. 91, ll. 10-23.
[43]    Exhibit B, Powe Depo Exhibit 1 at BMA 00008.
[44]    *Id*.
[45]    See Statement of Leisha Lindsey at para. 42.

was January 16, 2017, where Powe objected not to Lindsey's attendance, but rather that Lindsey had failed to respond to Powe's text message (using her personal phone) within thirty nine (39) minutes even though Lindsey had been in the Bunkie Clinic performing her job duties and could have been reached by other means.[46]

Lindsey refused to sign this document as well, because, notwithstanding what it stated, all issues discussed therein had been addressed and corrected, and she believed that all were false and were pretextual for the retaliatory conduct against her.[47] Following the issuance of this Final Written Warning, and as a protective mechanism, Lindsey began clocking in and out of the office, only to be reprimanded by Powe for doing so and instructed to stop.[48] Nevertheless, Lindsey continued to work and to perform her job duties despite the retaliatory conduct she believed she was receiving from Powe, believing that  Powe's new supervisor at BMA, Carol Dark, Quality Manager, would hear her complaints.[49]

On February 6, 2017,  Lindsey wrote Powe's new supervisor, Carol Dark, and for the first time in writing complained that she believed that Powe, and thus, BMA were retaliating against her because of her protected leave stating "I have never in my life had that happen until the last couple of months after returning from LOA [leave of absence].[50]  Instead of addressing the issues raised by Lindsey in her complaint, Ms. Dark made Powe aware of this complaint, and Powe understood that Lindsey was making a complaint of retaliation following her protected FMLA leave.[51] No investigation was done by BMA, nor were Lindsey's complaints ever addressed. However, a little

---

[46]    Exhibit B, Powe Depo at pp. 92-102.
[47]    See Statement of Leisha Lindsey at para. 44.
[48]    Exhibit B, Powe Depo at pp. 106-107.
[49]    See Statement of Leisha Lindsey at para. 46.
[50]    Exhibit B, Powe Depo at pp. 102-103.
[51]    Exhibit B, Powe Depo at pp. 103-105.

over one month later, on March 21, 2017, Powe, the person against whom Lindsey had filed a complaint, executed a written evaluation of Lindsey's job performance for the year 2016.[52]

For the first time in Lindsey's nearly nineteen (19) years with BMA, Lindsey received a job evaluation for "leadership" of "needs improvement" signed by Powe, and later by Dark – both of whom were aware of Lindsey's complaints of retaliation.[53] She received this "needs improvement" despite the fact that the evaluation category scores would have given her a "commendable." [54] Specifically, the narrative of the 2016 performance evaluation read: "During 2016, Leisha [Lindsey] had some issues of not meeting management expectations *of being present at the facility during normal operating hours. She made improvements in 2017. Staff morale has also improved*."[55] Such narrative is telling because: (i) prior to July, 2016, Lindsey had never been counseled or disciplined for not being present at the Bunkie Clinic, (ii) Lindsey was on protected FMLA from July 5, 2016 until August 16, 2016, (iii) Powe could identify no dates from August 17-September 6, 2016 where Lindsey failed to comply with attendance requirements; and (iv) following the issuance of a 60 day CAF/PIP, it is conceded by BMA that Lindsey did not have any continuing issues regarding attendance for the year 2016.[56] The only significant time that Lindsey was not at the Bunkie Clinic in the year 2016, was when she was on protected leave.

In the spring of 2017, the Bunkie Clinic was selected to participate in a Network 13 Project, which was a monthly catheter tracking tool used by Network 13, a government contractor which

---

[52]    Exhibit B, Powe Depo, Exhibit 1, labeled BMA 000018-22.
[53]    Exhibit B, Powe Depo at pp. 115-116.
[54]    Exhibit B, Powe Depo at pp. 117-122, Exhibit 1, labeled BMA 000018-22 and, specifically, document labeled BMA 000021, which shows an overall rating of 3.5, which should have rounded up to "commendable."
[55]    Exhibit B, Powe Depo at pp. 116.
[56]    Exhibit B, Powe Depo at pp. 115-119.

oversees and regulates dialysis clinics on behalf of the Center for Medicine and Medicaid Services.[57]

As part of this project, the Bunkie Clinic was to submit a monthly report to assist in the catheter tracking project.[58] The suggested date for submission of the report was the fifth of the month; however, Lindsey was never given any written instructions that this was a fixed deadline or that it was to be given priority over any other deadlines that were fixed deadlines.[59] Lindsey attempted to comply with this requested due date;[60] however, on occasion she submitted the same past the suggested fifth of the month.[61] Lindsey was never counseled regarding this issue in any form of discipline under BMA progressive discipline procedures, and, as noted, she was unaware of any fixed deadlines.[62]

On August 1, 2017, less than a year after Plaintiff returned from her leave under the FMLA and after she had voiced her opposition to violations of state law, and within six months of her written complaints of retaliation to Carol Dark, Lindsey's employment was terminated. The stated reason for the termination of her employment was: attendance (for July 15, 2017, a date when she was, in fact, present in Alexandria in a meeting with Powe)[63] and delays in preparing Network 13 Reports (an allegation for which she had never once been counseled, warned, or suspended).

## A.    LEGAL STANDARDS FOR SUMMARY JUDGMENT

FRCP 56(a)provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[57]    See Leisha Lindsey Statement at para. 56.
[58]    See Leisha Lindsey Statement at para. 57.
[59]    See Leisha Lindsey Statement at para. 58.
[60]    See Leisha Lindsey Statement at para. 59-60.
[61]    See Leisha Lindsey Statement at para. 59-60.
[62]    See Leisha Lindsey Statement at para. 59-60.
[63]    See Leisha Lindsey Statement at para. 61.

of law," but it is not without its limitations. The movant must support each material fact upon which it relies with competent summary judgment evidence. FRCP. 56(c). Federal courts, including the Fifth Circuit, have noted that a court has discretion to deny even a properly supported motion for summary judgment. *Kunin v. Feofanov*, 69 F.3d 59, 62 (5th Cir. 1995) (per curiam)(affirming the district court's opinion, including that "even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'a better course would be to proceed to a full trial.").[64] This is so even when the motion is not opposed, *Veillon v. Exploration Servs., Inc.*, 876 F. 2d 1197, 1200 (5th Cir. 1989), and particularly true "when examining the factual question of intent." *Wallace v. DTG Operations, Inc*., 442 F. 3d 1112, 1118 (8th Cir. 2006). Indeed, the Supreme Court notes that we have a "deep-rooted historic tradition that everyone should have his [or her] own day in court." *Martin v. Wilks*, 490 U.S. 755, 762 (1989).[65]

Furthermore, the mere act of "filing a summary judgment motion does not immediately compel the party opposing the motion to come forward with evidence demonstrating material issues of fact as to every element of its case." *Russ v. International Paper Co*., 943 F. 2d 589, 591 (5th Cir. 1991). Instead, the moving party must first demonstrate with competent evidence the absence of a genuine issue of fact material to the non-moving party's case, even when the non-movant will bear the burden of proof at trial. *Id*. Then, and only then, the non-moving party must affirmatively prove that a genuine issue as to such fact exists. In this regard, the non-moving party is not required to prove all of the elements of its case-in-chief but only show that the moving party is incorrect as to the absence of a genuine issue of material fact. The court must view the facts "drawing all inferences most favorable to the party opposing the motion." *Randolph v. Laeisz*, 896 F. 2d 964,

---

[64]     Quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255-256 (1986).
[65]     Quoting 18 C. Wright, A. Miller, et al., *Federal Practice and Procedure* § 4449, at 417 (1981).

969 (5th Cir. 1990).[66]  Summary judgment is only proper "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.*

## B.       THE FAMILY AND MEDICAL LEAVE ACT

The Family and Medical Leave Act ("FMLA") was enacted to "entitle employees to take reasonable leave for medical reasons." 29 U.S.C. §2601(b)(2). It prevents an employer from interfering with an employee's right to medical leave, e.g. denying them the benefits of leave, which includes denial of job restoration, and from retaliating against the employee for taking medical leave, e.g. discharging them after taking leave. 29 U.S.C. §2615(a) FMLA claims are asserted under two general categories (i) interference claims asserted under 29 U.S.C. § 2615 (a)(1) and (ii) retaliation claims asserted under 29 U.S.C. § 2615(a)(2). The significance in the distinction is that interference claims generally do not require proof of wrongful intent, but retaliation claims do.[67]

### 1.       *Lindsey Has a Prima Facie Case of Interference Under FMLA*

To ensure employer compliance, the FMLA mandates that employees who take FMLA leave shall be entitled to restoration to their old positions. *Id.* § 2614(a).  As such, the FMLA makes it unlawful for any employer to "interfere with, restrain, or deny" the exercise of any right provided under the FMLA. *Id.* § 2615(a)(1). For an employee to establish a prima facie FMLA interference claim, the employee "must show: (1) she was an eligible employee; (2) her employer was subject to FMLA requirements; (3) she was entitled to leave; (4) she gave proper notice of her intention to take FMLA leave; and (5) her employer denied her the benefits to which she was entitled under the FMLA." *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017).  BMA concedes that the first

---

[66]      Quoting *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F. 2d 577, 578 (5th Cir. 1986).
[67]      Intent is not relevant for FMLA interference. *Mauder v. Metro. Transit Auth. of Harris County*, 446 F.3d 574, 580 (5th Cir. 2006); See also, *Jackson v. BNSF Railway Co*, 2018 U.S. App. LEXIS 29890 (5th Cir. Oct. 23, 2018).

through third prongs of this test are satisfied. The only issue contested by BMA is the fourth prong: "Plaintiff has failed to present any evidence that he was denied any benefits to which he was entitled under the FMLA."[68] This statement is not true as Lindsey was coerced to work while she was on FMLA believing that if she did not do the same, her employment would be terminated.[69] The Fifth Circuit has recognized this coercion can constitute interference with protected FMLA leave. *D'Onofrio v. Vacation Publs.,* 888 F.3d 197 (5th Cir. 2018) (giving employee an option to work while on leave does not constitute interference with FMLA rights so long a working while on leave is not a condition of continued employment, but noting that an employer may violate employee's FMLA rights by coercing her to work while on leave.) See, also, *Evans v. Books-a-Million*, 762 F.3d 1288, 1297 (11 Cir. 2014), *Massey-Diaz v. Univ. of Iowa Comty. Med. Servs. Inc*., 826 F.3d 1149, 1159060 (8th Cir. 2016). As such, Lindsey has set out a *prima facie* case for interference, and such a claim does not require proof of discriminatory intent. At a minimum a genuine issue of fact is created regarding whether or not from a perspective of Lindsey, her continued employment was conditioned on her working during leave.

## 2.    *Lindsey Has a Prima Facie Case of Retaliation Under FMLA*

To prove a *prima facie* case of retaliation under FMLA, a plaintiff must show that "(1) she was protected by the FMLA, and (2) she suffered an adverse employment decision; and either (3) a) that she was treated less favorable than an employee who had not requested leave under the FMLA; or b) the adverse decision was made because she took FMLA leave." *Lushute v. Louisiana*, 479 Fed. Appx. 553, 554 (5th Cir. 2012).[70] Even requesting FMLA leave is considered "protected

---

[68]    R. 20.
[69]    See also Statement of Leisha Lindsey at para. 8-11.
[70]    Citing *Hunt v. Rapides Healthcare Sys. LLC,* 277 F. 3d 757, 768 (5th Cir. 2001); see also *Mauder v. Metro. Transit Auth. of Harris County*, 446 F. 3d 574, 583 (5th Cir. 2006).

13

activity." *Miles-Hickman v. David Powers Homes, Inc.*, 589 F. Supp. 2d 849, 875 (S.D. Tex. 2008).[71] Here, it cannot be seriously disputed that Lindsey engaged in protected activity by requesting and taking FMLA leave. Moreover, while BMA completely ignores the fact that Lindsey wrote Powe's supervisor, Carol Dark, and complained of retaliatory conduct, this, too, constitutes protected activity.[72] BMA's failure to acknowledge these two acts of protected activity distorts the timeline of events presented in the BMA Motion. Further, BMA contests that (i) Lindsey suffered an adverse employment action, and (ii) the adverse actions were because Lindsey took FMLA leave.[73] Genuine issues of fact exist as to both assertions.

a)   ***The Corrective Action, the Performance Improvement Plan, the Final Written Warning, Lowered Performance Evaluation and the Termination of Lindsey's Employment Constitute Adverse Actions***

BMA contends that "disciplinary write-ups are not adverse employment actions under the FMLA"[74] In support of this contention, BMA relies upon cases in the Fifth Circuit that are distinguishable. More damning, however, BMA ignores the Supreme Court precedent *Burlington Northern and Santa Fe Railway Co v. White* 548 U.S.53 (2006). In *Burlington*, the Supreme Court

---

[71]   See also *Bertrand v. City of Lake Charles*, 2012 U.S. Dist. LEXIS 63330, 17-18 (W.D. La. 2012).

[72]   The Fifth Circuit has defined protected activity as "opposition to any practice rendered unlawful…., including making a charge, testifying, assisting, or participating in any investigation, proceedings, or hearing under Title VII." *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003). To invoke the anti-retaliation provisions, an employee's complaint must communicate merely in some way that there is unlawful discrimination. *Broderick v. Donaldson*, 437 F. 3d 1226, 1232 (D.C. Cir. 2006) (no "magic words" are required), *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) at p. 805 ("an informal complaint by an employee attempting to protest or correct allegedly discriminatory conditions of employment is sufficient"). This principle was recently reaffirmed in the Supreme Court's decision of *Kasten v. Saint-Gobain Performance Corp.,* 1131 S.Ct. 1325 (2011) (oral complaints under the Fair Labor Standards Act are sufficient as to conclude otherwise would "discourage the use of informal workplace grievance procedures").

[73]   R. 20-1, pp 4-8.

[74]   R. 20-1, p. 1, pp. 5-6.

stated that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington, supra* at 68. The Court further explained its test and clarified that it phrased the "standard in general terms because the significance of any given act of retaliation will often depend upon the particular circumstances, *Id*, (giving the example that a schedule change might "make little difference to many workers, but may matter considerably to a young mother with school age children.") *Id.* Thus, applying *Burlington's* new standard, what constitutes an adverse action becomes an issue of fact.

BMA contends that corrective action and other forms (Final Written Warning and Lowered Performance Evaluation) are per se not materially adverse actions. Such an assertion demonstrates a complete misunderstanding of the Supreme Court's mandate to review corrective actions, performance improvement plans and the like from the reasonable perspective of the employee based upon the circumstances of the employee to determine whether a reasonable person would be dissuaded from making or supporting a charge of discrimination. ***Simply put, this is a fact issue.***

Additionally, none of the cases relied upon by BMA hold otherwise, and all are factually distinguishable from this case.   For example, in *Credeur v. Louisiana Through Office of Attorney General*,  860 F.3d 785 (5th Cir. 2017) the Fifth Circuit did not hold that a "last chance agreement" could never be an adverse action – the court only held that where "the record demonstrates that Credeur [plaintiff] suffered no disciplinary actions flowing from Last Chance Agreement" such action alone, under those particular facts did not constitute an adverse action. Interestingly, the Fifth Circuit noted in *Credeur* that the plaintiff in that case had not been terminated from her employment, but had voluntarily resigned. Lindsey's case is clearly factually distinguishable as CAF/PIP, the Final Written Warning and the lowered performance evaluation were, most certainly,

15

followed with disciplinary action…ie. the termination of Lindsey's employment. As such, BMA's reliance on *Credeur* is misplaced. Likewise, the case of *Simmons-Meyers v. Caesars Entmt Corp, 515 Fed.Appx 369 (5th Cir 2013)* does not support BMA's contention. In fact, in *Simmons-Meyers*, the Fifth Circuit held that there were no non-termination gender and retaliation claims before the Court because the plaintiff in *Simmons-Meyers* did not "properly raise these issues on appeal." Thus, any discussion of what does or does not constitute an adverse action in that case is total dicta and simply cannot undermine the Burlington standard set by the Supreme Court.  Finally, the  same is true for the case of *Hernandez v. Johnson, 514 Fed. Appx 492 (5th  Cir. 2013)* where addressing the plaintiff's alleged five allegedly retaliatory employment actions, the Fifth Circuit held that a "Letter of Counseling/Recorded Infraction" was not an adverse action under the facts of that case citing a D.C. Circuit court opinion and relying upon a case where only a single written warning was given. More importantly, the Fifth Circuit noted in the *Hernandez* case, that the plaintiff "offered no evidence of pretext with regard to either."   In contrast, as shown below, Lindsey offers significant evidence of pretext.

Applying the Supreme Court precedent of *Burlington*, it is clear that adverse actions occurred in the form of CAF/PIP, issuance of a Final Written Warning, issuance of a lowered job performance evaluation, and ultimately, the final disciplinary act of termination of Lindsey's employment. At a minimum, genuine issues of fact exist.

b)      ***The Adverse Actions, Including the Termination of Lindsey's Employment Were Motivated by Lindsey's Taking of Protected Leave Under the FMLA***

 As noted earlier, BMA incorrectly applies the "but for" standard for FMLA cases when the "motivating factor" standard is correct. The Fifth Circuit held in  *Richardson, supra,* that the mixed-motive framework applies to FMLA claims in which retaliatory animus was a motivating factor in an adverse employment action. To escape liability under this framework, an employer

must show that the retaliation was not the motivating factor. See also, *Ion, supra*; *Vincent v. Coll of the Mainland*, 2016 U.S. Dist. Lexis 135122, n. 31 (S.D. Tex. Sept 30, 2016). Clearly, BMA cannot do so.

BMA contends that "Plaintiff has no facts to suggest a causal connection between her FMLA and her discipline, much less her termination from employment."[75] In fact, Lindsey has plenty of facts to suggest a causal connection. An appreciation for the timeline of events is critical to understanding this case. Sometimes pictures help. As shown in the timeline attached to this Memorandum as Exhibit A, every time Lindsey engaged in a protected activity, an adverse action shortly followed.

In order to counteract the clear temporal connection between Lindsey's return to work from FMLA and the subsequent adverse action of the issuance of the CAF/PIP, BMA, self-servingly claims that Powe, Lindsey's supervisor "made the decision to issue Plaintiff's first Corrective Action and PIP before she went on FMLA leave in July, 2016."[76] One must ask the question: Why, then, did Powe fail to issue the CAF/PIP before Lindsey took protected leave? The mere failure to take such action pre-FMLA leave and to then take such action within 21 days of an employee's return to work from protected FMLA leave raises a genuine issue of fact. Further, it is conceded by BMA and Powe that from the time period of August 15, 2016 – September 2, 2016, there were no documented instances of Lindsey failing to be "consistently present at the facility during normal hours."[77] The issuance of a CAF/PIP a mere 22 days after an employee's return to work for conduct which did not occur after the employee returned to work is, at best, suspicious, and, thus creates a fact issue.

---

[75]     R. 20-1, p. 6.
[76]     R. 20-1, p. 14.
[77]     Powe Depo, at pp.85-86.

The second adverse action, the issuance of the Final Written Warning, can likewise be connected to the FMLA leave of Lindsey. This Final Written Warning was issued four months after Lindsey's return from FMLA leave and less than two months after it is acknowledged by Powe that Lindsey had complied the CAF/PIP.  Even worse, this Final Written Warning counsels Lindsey for actions  which occurred while Lindsey was on the CAF/PIP  (ie. September 28, 2016), which, once again, it was acknowledged that Lindsey satisfied. The other two dates and documented instances are so minimal that they clearly do not justify the deviation from BMA's own progressive discipline policy.

The third adverse action, the 2016 Performance Evaluation, that was lowered to "needs improvement" despite the fact that her actual mathematical score was "commendable," is likewise shown to be an adverse action.  This 2016 Performance Evaluation was issued in March 2017, and specifically references Lindsey's 2016 attendance, when, as shown on the Statement of Facts above, the only significant time Lindsey was not present at the Bunkie Clinic was the time she was out on protected FMLA.  Further, it is telling that this Performance Evaluation, was given less than two months from the time that Lindsey engaged in her second protected activity: writing a complaint of FMLA retaliation to Carol Dark – a complaint that Ms. Dark shared with Lindsey's 2016 evaluator, Powe.

The fourth adverse action, was, of course, the termination of Lindsey's employment – something which occurred almost one year to the date of her return from FMLA leave, and less than six months following Lindsey's written complaint of FMLA retaliation to Carol Dark. This termination was based upon an alleged failure to comply with Network 13 deadlines, when there is no evidence that the requested submission dates were, in fact, deadlines rather than suggested dates,

when Lindsey had never been counseled for any dilatory submission and when the termination itself was also based upon several deviations by BMA from it is own progressive discipline policy.

Clearly, Lindsey does rely on the temporal proximity of her termination of employment to this taking of leave – but as shown above, *she does not rely on temporal proximity alone*. The temporal proximity between Plaintiff's FMLA leave and the adverse employment actions alleged suffice to establish the requisite causal link: "[w]hen evaluating whether the adverse employment action was causally related to the FMLA protection, the court shall consider the "temporal proximity" between the [FMLA-protected activity] and the termination." *Mauder v. Metropolitan Transit Authority*, 446 F.3d 574 at 583 (5th Cir. 2006). The Fifth Circuit has held that "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the "causal connection" required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Serv. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citation omitted). Further, the Fifth Circuit has noted that "[t]he FMLA's protection against retaliation is not limited to periods in which an employee is on FMLA leave*, but encompasses the employer's conduct both during* and *after the* employee's FMLA leave." *Hunt*, 277 F.3d at 768-69 (emphasis added).

The Fifth Circuit has held that a time period of five days between the employee's protected activity and an adverse action was sufficient on its own to establish the causal connection element of plaintiff's *prima facie* retaliation claim. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (a Title VII claim). See also, *Jones v. Gulf Coast Heath Care of Delaware*, 854 F.3d 1261 (11th Cir. 2017). Furthermore, a fifteen-day lapse and a two-and-one-half month lapse may create an inference of a causal connection. *See Ware v. CLECO Power LLC*, 90 Fed. Appx. 705, 708 (5th Cir. 2004); *Richard v. Cingular Wireless LLC*, 233 Fed. Appx. 334, 338 (5th Cir. 2007). Our own district has held that four months is close enough. See, *Stump v. City of Shreveport,* No. CIV A 13-

3053, 2015 U.S. Dist. LEXIS 134989, 2015 WL 5794474 at *46 (W.D. La. Sept. 30, 2015) (four month time period or possibly more is not too attenuated to establish pretext). These cases are consistent with United State Supreme Court precedent *Clark County School District v. Breeden, Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001),* where the Supreme Court noted that "courts that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close," and further noted that time periods of three and four months had been found by the appellate courts to be very close. Clearly, then, as shown in the timeline of events, temporal proximity supports both causation and pretext.[78]

When one looks at  all the evidence presented by Lindsey, a genuine issue of fact exists as to whether or not Lindsey's taking of leave under the FMLA was a motivating factor in each and every one of the adverse actions taken against her, including, but not limited to, the termination of her employment.

### 3.    *BMA's Proferred Legitimate Business Reason for Taking Adverse Employment Action is Pretextual*

When a plaintiff does not produce direct evidence of discrimination, courts use the *McDonnell Douglas* burden shifting framework in FMLA cases. *Lorentz v. Alcon Labs., Inc.*, 13-20049, 535 Fed. Appx. 319, 2013 U.S. App. LEXIS 13728, 2013 WL 3368987 (5th Cir. July 8,

---

[78]    BMA attempts to argue that none of the above matters as it contends it has not retaliated against other employees who have taken FMLA; however, Lindsey's case must be judged on its own facts, and such, a contention is, simply put, irrelevant, and does not erase the fact that a genuine issue of fact exists as to whether or not Lindsey's taking of protected FMLA leave motivated the adverse actions against her. For example, if a husband beats his second wife, but did not beat his first or third wife, the second wife has still been the victim of a crime and is still bruised. The same analogy applies here, and Lindsey's case should be judged based on its own factual circumstances.

2013) (citing *Hunt, supra*). Under this framework, Lindsey bears the initial burden of establishing a *prima facie* case.  As shown above, Lindsey has clearly done so. BMA must, then, articulate a legitimate, non-discriminatory reason for the adverse actions taken against Lindsey. If BMA does so, then the burden shifts back to Lindsey to establish by a preponderance of evidence that BMA's proffered reason is a pretext for discrimination. *Id.* Alternatively, Lindsey can avoid summary judgment by showing by a preponderance of the evidence that "the employer's reason, although true, is but one of the reasons for its conduct, another of which was discrimination." *Ion, supra*; *Richardson v. Monitronics International, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005) (Mixed-motive framework applies to FMLA cases). If the employee proves that discrimination was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action despite the discriminatory animus. The employer's final burden "is effectively that of proving an affirmative defense." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005).

For all the reasons set forth in Section B.2.b above, all of the adverse actions taken against Lindsey are, likewise, be shown to be pretextual.  Specifically, with respect to Lindsey's termination, there are no documented instances of attendance issues following the Final Written Warning, and there are genuine issues of fact as to whether or not the Network 13 deadlines were actual deadlines or why BMA's progressive discipline policy should not have been followed with respect to that issue. Clearly, then, an issue of fact exists.[79] Accordingly, BMA's Motion should be denied in its entirety, and Lindsey should be allowed to proceed to trial.

---

[79]    BMA's seeming reliance upon the argument that no one mentioned Lindsey's FMLA after she returned from leave is disingenuous, as the CAF/PIP states specifically that her "attendance" was an issue, and prior to the issuance of the CAF/PIP, Lindsey had always received commendable job evaluations, never been disciplined for her attendance, and Powe

**C.**    **LOUISIANA'S WHISTLEBLOWER PROTECTION ACT AND LOUISIANA EMPLOYMENT DISCRIMINATION LAW**

The Louisiana "whistleblower" statute, La. R.S. 23:967, provides that "an employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law... [the employee] objects to or refuses to participate in an employment act or practice that is in violation of law." La. R.S. 23:967(A)(3).  Within the meaning of La. R.S. 23:967, Lindsey, in good faith, advised BMA that giving patients medications left over from deceased patients violated federal and state laws. Further, within the meaning of La. R.S. 23:967, Plaintiff, objected to, or refused to participate in this practice.

BMA contends because no violation of state law occurred, no actionable retaliation exists. Such an argument is incorrect. First, the distribution of medication contrary to a prescription order does, in fact, violate both federal law and state law. LA. Rev Stat Ann § 40:971(E)., LA. Rev Stat Ann § 40:971(E). It is conceded that this distribution was proposed, and it is conceded that Lindsey objected to and refused to participate in the same. Whether or not BMA actually went through with the proposal to distribute such medication in violation of state law is not relevant. The protected act is the objection to or refusal to participate in ***any proposed*** violation of state law. And, that is exactly what occurred here.

BMA further contends that none of the alleged adverse actions against Lindsey amount to "reprisal" under the Louisiana "whistleblower" statute, La. R.S. 23:967. Such an argument ignores the clear language of the statute which broadly defines "reprisal" as follows:

> "Reprisal" includes firing, layoff, loss of benefits, ***or any discriminatory action*** the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section …" (emphasis added)

_____

could not identify one day following Lindsey's return from FMLA leave when she had not been in the office as required.

As shown on the timeline attached hereto and made a part hereof as Exhibit "A" BMA's reprisal was swift. The CAF/PIP (a discriminatory/retaliatory act) was drafted by Powe on September 2, 2016 (the same date Lindsey objected) and the issued only four days later. This "reprisal" continued up to and including the termination of her employment. Both the temporal connection and the lack of evidentiary basis to the support the adverse actions raises a genuine issue of fact such that summary judgment should be denied.

## D.    **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

Finally, Lindsey has made a claim of intentional inflection of emotional distress. In order to recover for intentional infliction of emotional distress, a plaintiff must establish (1) that the conduct of the defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto*, 585 So. 2d 1205, 1209 (La. 1991) The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests. *Id.* at 1209-10.  There is no "privilege" under Louisiana law for employers to act in ways that could cause an employee emotional distress.  The Supreme Court has acknowledged that the tort of intentional infliction of emotional distress can occur in the workplace environment.  *Bustamento v. Tucker*, 607 So.2d 532, 538 (La. 1992).  Indeed, "[a] plaintiff's status as an employee may entitle him to a greater degree of protection from insult and outrage by a supervisor with authority over him than if he were a stranger." *White,* 585 So.2d at 1210.[80]

---

[80]    This court is bound to apply the law as it is or would be applied by the Supreme Court of the State of Louisiana. *Transcontinental Gas. v. Transportation Ins.*, 953 F.2d 985 (5th Cir. 1992).

It is clear that there is no per se exclusion for employment disputes.  A series of employment disputes was at issue in the case of *Maggio v. St. Francis Med. Ctr., Inc.*, 391 So.2d 948 (La. App. 2d Cir. 1980), which was cited with approval by the Louisiana Supreme Court in *White*.  In *Maggio*, a series of employment disputes were held sufficient to constitute intentional infliction of emotional distress.  The plaintiff in that case alleged, among other things, that his supervisor replaced him as associated executive director, demoted him to a menial position, removed his office to a secluded area, threatened him with loss of his job, and terminated his employment without just cause when he refused to sign.  The court in *Maggio* held that the alleged acts of the supervisor were "of such a nature as to necessarily be calculated and intended to make plaintiff's working conditions unbearable and to cause him mental and emotional distress." *Id.* At 950.  Accordingly, the court denied the employer's motion for summary judgment on the plaintiff's intentional infliction of emotional distress claim.

A second important feature of Louisiana law is that the courts do not take individual acts of conduct and examine them for outrageousness, but consider all of the conduct as whole to determine whether it rises to the level of intentional infliction of emotional distress.  In *White*, for example, the court indicated that the tort of intentional infliction of emotional distress in a workplace environment would be found when there is a "pattern of deliberate, repeated harassment over a period of time." 607 So.2d at 538.  In *Bustamento*, the court expounded upon this statement, explaining as follows:

> [C]onduct which, viewed as an isolated incident, would not be outrageous or would not be likely to cause serious damage, can become such when repeated over a period of time.  This has been characterized as a sliding scale approach under which even relatively 'mild' harassment may become tortuous if continued over a substantial period of time.

607 So.2d at 538 (citations omitted).  The situation is analogous to the rule in Title VII cases that

24

courts must adjudge a defendant's behavior based upon the "totality of the circumstances," focusing not on individual instances but upon the overall scenario. *Id.* at 542, n. 16 (quoting *Andrews v. City of Philadelphia*, 895 F 2d 1469, 1484 (3d Cir. 1990)); *accord Wright v. Otis Engineering Corp.*, 643 So. 2d 484, 487 (La. App. 3 Cir. 1994) (denying employer's motion for summary judgment on intentional infliction claim.). Clearly, then, this Court must look to the totality of the circumstances and examine all facts in favor of Lindsey.

The conduct described by Lindsey includes conduct where she was under close, intense, and constant scrutiny, subjected to disciplinary action and continuously harassed – all because she took protected leave under the FMLA and dared to object to and refuse to participate in state law violations regarding prohibited practices. This is the exact type of a "pattern of deliberate, repeated harassment over a period of time" contemplated by the courts in *White* and *Bustamento*. Given the totality of these circumstances, Lindsey should be allowed to go to trial on this claim.

## IV.    CONCLUSION

For all of these reasons, the BMA Motion for Summary Judgment is unwarranted.  BMA has not shown under the burden shifting framework of *McDonnell Douglass* and the appropriate standards of burden shifting that termination of Lindsey's employment did not violate the FMLA and applicable state law. Therefore, BMA's Motion for Summary Judgment should be denied.

Respectfully submitted by:

_____
            *s/ Allison A. Jones*

Allison A. Jones, T.A.
    La. Bar Roll No. 16990
DOWNER, JONES, MARINO & WILHITE
401 Market Street, Suite 1250
Shreveport, LA 71101
Phone:   (318) 213-4444
Fax:     (318) 213-4445
    ***Attorneys for Leisha Lindsey***

26