UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| LEISHA LINDSEY | CASE NO. 1:18-CV-00680 |
| VERSUS | |
| FRESENIUS MEDICAL CARE LOUISIANA DIALYSIS GROUP, LLC | JUDGE DEE D. DRELL<br>MAGISTRATE JUDGE PEREZ-MONTES |

## RULING

Before the court is a motion for summary judgment (Doc. 20) filed by Defendant Bio-Medical Applications of Louisiana, LLC ("BMA")[1] and BMA's motion to strike Leisha Lindsey's summary judgment evidence (Doc. 28).

In their motion to strike, BMA asks the court to strike the "demonstrative timeline" found at Exhibit A of Lindsey's opposition to the motion for summary judgment (Doc. 26-2) as well as the "Statement of Leisha Lindsey" also attached to her opposition. (Doc. 26-5). The court finds both the timeline and the statement to contain what should have been argued in brief; however, had Lindsey done so, she would have further expanded her page limitation[2]. Accordingly, we do not consider either document and we deny BMA's motion to strike as MOOT.

In its motion for summary judgment, BMA seeks dismissal of all claims asserted by Lindsey for interference with the Family Medical Leave Act ("FMLA"), retaliation for taking leave pursuant to the FMLA, violation of the Louisiana Whistleblowers Statute and intentional

---

[1] BMA was incorrectly identified in the complaint as Fresenius Medical Care Louisiana Dialysis Group, LLC but answered the complaint in its correct nomenclature.
[2] Lindsey's opposition is 26 pages in length, not the 25 set forth in this court's Local Rule 7.8. Though the 26th page is nothing more than a signature line, the court recognizes the shrinking of font and line spacing on her Table of Authorities to allow for an initial expansion of the page limitation.

infliction of emotional distress. For the reasons contained herein, the motion for summary judgment will be GRANTED.

I. **Relevant Facts**

Lindsey was hired as a staff registered nurse by BMA, a provider of dialysis services in central Louisiana, on January 18, 1999. Within a year of her hire, Lindsey was promoted to charge nurse and just a few years later, in September 2003, she was promoted to Director of Nursing of the Bunkie, Louisiana Clinic. In 2008, the Director of Nursing title was changed to Clinic Manager, a position she retained through the time she was terminated on August 1, 2017.

On July 5, 2016, Lindsey experienced a fire at her home, which caused her to take a leave of absence under the FMLA. In mid-July, Lindsey notified her supervisor, David Powe ("Powe"), that she needed to extend her leave of absence. BMA approved Lindsey's leave and she remained out through August 16, 2016.

On August 31, 2016, Lindsey attended a meeting with various BMA employees, including Powe and Cecelia "Toby" Robinson ("Robinson"). During the meeting, Robinson mentioned the possibility of giving prescribed medications left over from deceased patients to current patients. Lindsey voiced her objection to following such a protocol because she thought it was illegal and unethical. Lindsey reasserted her objection in an email on September 2, 2016.

On September 6, 2016, Lindsey and Powe met and Powe advised that her lack of attendance during regular clinic hours was a problem that was affecting staff morale. Powe issued a Documented Counseling Corrective Action and a Performance Improvement Plan to Lindsey but she refused to sign the documents because she believed them to be retaliatory in nature.

Powe continued to follow Lindsey's compliance with the corrective actions set forth in the "Corrective Action Form" and the "Performance Improvement Plan" and by November, he found

2

her to have improved. Nevertheless, on January 30, 2017, Powe issued to Lindsey a "Corrective Action Form" which provided her with a "final written warning." Lindsey again refused to sign the Corrective Action Form believing it was all in retaliation for exercising her right to take leave.

On February 1, 2017, Lindsey emailed Powe claiming she was being falsely accused of not working and on February 6, 2017, Lindsey emailed Quality Manager Carol Dark ("Dark"), Powe's supervisor, complaining of retaliation by Powe. According to Lindsey, Dark never investigated the complaint but instead, merely informed Powe the complaint was made.

Lindsey asserts that in retaliation for her having complained to Dark, Powe issued an unfavorable performance evaluation of Lindsey, on March 21, 2017. According to Lindsey, it was the first time in her 19-year career that she received an evaluation of "needs improvement."

Around that same time period, Network 13, a government contractor which oversees and regulates dialysis clinics on behalf of the Center for Medicare and Medicaid Services, consulted with BMA about participating in a long-term catheter project. The project was approved and was known as the "Network 13 catheter tracking" project. Lindsey was responsible for submitting a monthly tracking tool to assist with the catheter tracking project and was to participate in an orientation to learn what was required. Lindsey, who claims there was no firm deadline for submission of the tracking tool report, submitted reports beyond the purported due date of the 5th of each month. This deficiency was brought to the attention of Dianne Garrand ("Garrand"), President of Quality Control for BMA via an email from Network 13 on July 12, 2017.

The following day, various BMA supervisors, including Garrand and Powe, attempted to reach Lindsey, but she was out of the office for a meeting in Alexandria, Louisiana. It was at this point that Powe met with Dark and BMA's human resource officer. All three agreed Lindsey should be terminated. Accordingly, on August 1, 2017, Powe and Dark met with Lindsey to inform

her of the same. The termination form listed the reason for termination as continued absences from the clinic during working hours and failure to timely submit the required reports to Network 13. Again, Lindsey refused to sign the termination papers believing her termination was in retaliation for taking FMLA leave.

**II.     Summary Judgment Standard**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anders on v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). We consider "all evidence in the light most favorable to the party resisting the motion." Seacor Holdings, Inc. v. Commonwealth Ins. Co., 635 F.3d 680 (5th Cir.2011) (internal citations omitted). It is important to note that the standard for summary judgment is two-fold: (1) there is no genuine dispute as to any material fact, and (2) the movant is entitled to judgment as a matter of law.

The movant has the burden of pointing to evidence proving there is no genuine dispute as to any material fact, or the absence of evidence supporting the nonmoving party's case. The burden shifts to the nonmoving party to come forward with evidence which demonstrates the essential elements of his claim. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The nonmoving party must establish the existence of a genuine issue of material fact for trial by showing the evidence, when viewed in the light most favorable to him, is sufficient to enable a reasonable jury to render a verdict in his favor. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); Duffy v. Leading Edge Products, Inc., 44 F.3d 308, 312 (5th Cir.1995). A party whose claims are challenged by a motion for summary judgment may not rest on the allegations of the complaint and must

articulate specific factual allegations which meet his burden of proof. Id. "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." Duffy, 44 F.2d at 312, citing Anderson v Liberty Lobby, 477 U.S. at 247.

**III.  Analysis**

Interference with FMLA Leave

Lindsey alleges that she was required to continue working throughout her leave of absence under FMLA in violation of the statute. She testified in deposition that she addressed employee issues, scheduled staff to cover patient care, edited and approved payroll, addressed medication changes and lab reviews, and worked with the human resources recruiter to hire a registered nurse all while she was on leave.

"To establish a claim for FMLA interference, an employee must show that the defendant 'interfered with, restrained, or denied her exercise or attempt to exercise FMLA rights, and that the violation prejudiced her.'" D'Onofrio v. Vacation Publications, Incorporated, 888 F.3d 197, 209 (5th Cir. 2018) (quoting Brant v. Tex. Dep't of Aging & Disability Servs., 781 F.3d 764. 770 (5th Cir. 2015)). See also Cuellar v. Keppel Amfels, LLC, 731 F.3d 342, 347 (5th Cir. 2013); Ragsdale v. Wolverine World Wide, Inc, 535 U.S. 81, 89 (2002); Downey v. Strain, 510 F.3d 534, 539 (5th Cir.2007). As Lindsey fails to state a single manner in which she was prejudiced, we find this claim lacks merit and should be dismissed with prejudice.

Retaliation for Taking FMLA Leave

To establish a *prima facie* case of retaliation, Lindsey must show: (1) she was protected under the FMLA, (2) she suffered an adverse employment action; and (3) she was treated less favorably than an employee who had not requested leave under the FMLA or the adverse decision was made because she sought protection under the FMLA." Acker v. Gen. Motors, LLC, 853 F.3d

5

784, 790 (5th Cir. 2017) (quotation omitted). Once the plaintiff establishes a *prima facie* case of retaliation the burden shifts to the defendant to set forth a "legitimate, nondiscriminatory reason" for the termination. McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Thereafter, the burden shifts back to the plaintiff to establish by a preponderance of the evidence the reason articulated by the defendant is a pretext for retaliation. Id.

There is no dispute that Lindsey was protected under the FMLA or that she suffered an adverse employment action. However, there is a dispute as to whether the adverse employment action was only her termination, as suggested by BMA, or if the disciplinary actions, unfavorable review and the termination all constitute adverse employment actions.

An adverse employment action is found to exists when a reasonable employee would have found the alleged employment actions to be materially adverse. Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Considering, in this case, that Lindsey had worked for BMA for 19 years and throughout that time she was never reprimanded or counseled and received favorable performance reviews, it is likely that a reasonable employee would have found the actions taken by Powe to be materially adverse. We find this to be particularly so when Powe elevated the second Corrective Action Form to a Final Written Warning.

This finding is also important as to helps Lindsey to establish that 'there is causal link' between FMLA-protected activity and the adverse action." Acker v. GM, LLC, 853 F.3d 784, 790 (5th Cir.2017) (quoting Mauder v. Metro Transit Auth. of Harris Cty., Tex., 446 F.3d 574, 583, 583 (5th Cir.2006). Though there is no decision from the Fifth Circuit nor the Supreme Court as to whether the "but for" causation standard applies to FMLA retaliation claims, "the Supreme Court has held that in order to establish the causal link, temporal proximity, if offered by itself, must be 'very close.'" Leal v. BFT, Ltd. P'ship, 423 Fed.Appx. 476, 479 (5th Cir.2011) (citing

6

Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (per curiam) (noting that the time periods of three and four months had been found by the appellate courts to be "very close" and holding that a period of twenty-one months was not "very close). While there is not a "very close" connection between Lindsey's return from FMLA leave in August 2016 and her termination in August 2017, these adverse employment actions bridge the gap between those dates.

On September 6, 2016, within three weeks of returning to work, Lindsey received a Corrective Action Form stating she had not been present at the facility during normal working hours (8am to 5pm) and it was adversely affecting morale and operations at the facility. (Doc. 26-3, p. 63). On January 30, 2017, Lindsey received a final written warning via a Corrective Action Form. Therein, Powe stated she was "away from work multiple times without informing her manager or clinical staff" and then cited September 18, 2017, as a date he could not reach her. (Doc. 26-3, p. 65). Then, in March 2017, Powe issued an unfavorable employment evaluation in which he provided her an overall rating of "needs improvement" despite the fact her scores merited a rating of "commendable." (Doc. 26-3, p. 66). Finally, Lindsey was terminated in August 1, 2017, allegedly for absenteeism and failure to timely submit catheter tracking reports to Network 13. (Doc. 20-5, p. 32-33).

Lindsey received her first ever disciplinary action within three weeks of returning from FMLA leave. Though Powe testified the first Corrective Action was considered in June and July, before Lindsey took leave, he waited until September to meet with Lindsey and he failed to note a single date, either before or after she took leave, on which she was not at the facility during regular work hours. Powe also testified that in November Lindsey was improving, yet he issued another Corrective Action Form in January citing continued absenteeism with only one cited date, September 28, 2016. Accordingly, we find not only that there is a causal connection between

Lindsey's leave and her termination but that she has established a *prima facie* case of retaliation. Accordingly, we now look to the legitimate, nondiscriminatory reasons BMA set forth for terminating Lindsey.

BMA asserts that it terminated Lindsey for two reasons: because she failed to complete the catheter tracking reports by the 5th of each month and because of her absenteeism. In light of the foregoing discussion about the alleged absenteeism, we find Lindsey has established pretext by a preponderance of the evidence as to that reason for termination.

Turning to BMA's other reason, that she failed to complete the Network 13 reports by the 5th of each month, Lindsey asserts there was no hard deadline of the 5th of the month and she was never counseled that the reports should be sent by that date. The record evidence provides otherwise.

Lindsey was first made aware of BMA's desire, and Network 13's purported requirement, that the report was due on the 5th of the month on January 6, 2017. It was on that date that Lindsey submitted a tracking report. When asked why she did not submit the form the day before, she responded, "the staff member assigned to assist with this project was confused as to the due dates of each portion of the project and I just caught it today." (Doc. 26-4, p.15).

Further evidence of Lindsey's failure to comply with Network 13's deadlines include her failure to complete the required orientation and return an attestation form of completion by January 24, 2017. Instead, she completed the orientation the afternoon of January 25, 2017 and returned the attestation form on March 8, 2017, but only after Lynda Ball, the Quality Improvement Director for Network 13, asked for it by email. On June 5, 2017, Ball again emailed Lindsey, this time to remind her the catheter tracking report for May was due by end of business that day. Lindsey did not submit the report until June 7, 2017. Finally, Ball contacted Lindsey on July 7, 2017, stating

8

the tracking tool was due and had to be submitted before the end of business on July 10, 2017. When no report was submitted on July 12, 2017, Ball again emailed Lindsey but this time, she also contacted Lindsey's supervisors. At that point Dark and Powe determined Lindsey had to be terminated.

As Lindsey provides no evidence in support of her conclusory statement that the deadline of the 5th was not a firm deadline, she cannot overcome the legitimate, non-discriminatory reason for her termination. While she urges the court to look at the matter from a mixed-motive perspective, to do so would be improper. Lindsey would have to concede that BMA's reason, in this case that she failed to file the reports by the 5th of the month, was true but was only one of the reasons for its decision. See Richardson v. Monitronics Intern., Inc., 434 F.3d 327, 333 (5th Cir.2005)("The mixed-motive framework applies in cases in which the employee concedes that discrimination was not the *sole* reason for her discharge, but argues that discrimination was *a* motivating factor in her termination."). At no point has Lindsey ever conceded that the reasons set forth is true. Accordingly, we find no basis for a mixed-motive evaluation.

In light of the foregoing, Lindsey's retaliation claim must be dismissed.

<u>Violation of the Louisiana Whistleblower Statute</u>

Lindsey next claims BMA violated the Louisiana Whistleblower Statute when she was retaliated against for refusing to use prescribed medications of deceased patients. The Louisiana Whistleblower Statute provides: "An employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law…objects to or refuses to participate in an employment act or practice that is in violation of law." La. R.S. §23:967(A).

The Louisiana Supreme Court has held that a plaintiff "must establish that the employer engaged in workplace conduct constituting an actual violation of state law." Encalarde v. New

9

Orleans Ctr. For Creative Arts/Riverfront, 158 So.3d 826 (La. 2015) (citing Accardo v. La. Health Servs. & Indem. Co., 943 So.2d 381 (La.App 1 Cir. 2016); Hale v. Touro Infirmary, 886 So.2d 1210 (La.App. 4 Cir. 2004). The parties dispute not only whether or not Powe actually implemented a proposed policy to use medications of deceased patients but also whether a state law was violated.

Lindsey asserts "the distribution of medication contrary to a prescription order does, in fact, violate both federal[3] and state law" and cites the Louisiana Revised Statute §40:971(E) in support. The court, having read the entirety of §40:971, does not find a *prohibition* against the distribution of medication contrary to a prescription order. No other violation of a Louisiana law is alleged, and without the existence of an actual law to prohibit the conduct complained of, there cannot be a viable whistleblower's claim.

Intentional Infliction of Emotional Distress

Lindsey's final claim is for intentional infliction of emotional distress. To establish such a claim, Lindsey must prove: (1) BMA's conduct was extreme and outrageous; (2) the emotional distress suffered was severe; and (3) the defendant desired to inflict severe emotional distress or knew that it would be substantially certain to result from his/her conduct. White v. Monsanto Co., 585 So.2d 1205, 1209 (La.1991).

"Extreme and outrageous conduct" is conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Id. Though Lindsey asserts she was "under close, intense, and constant scrutiny," the incidents that she describes in no way rise to the level

---

[3] It is of no consequence whether a federal law was violated as the Louisiana Whistleblower Statute only covers violations of Louisiana law.

of extreme or outrageous conduct. As she cannot establish the first element of an intentional infliction of emotional distress claim, the claim will be dismissed.

## IV. Conclusion

For the reasons set forth above, BMA's motion for summary judgment will be granted as to all claims. The court will issue a judgment in conformity with these findings.

**THUS DONE AND SIGNED** this 9th day of April 2020, at Alexandria, Louisiana.

                                         **DEE D. DRELL, JUDGE**
                                    **UNITED STATES DISTRICT COURT**